Filed 5/10/21  P. v. Maljanian CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073573 |
| v. | (Super.Ct.No. 16CR057094) |
| JAMES E. MALJANIAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  David A. Williams, Judge.  Affirmed.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Tami Falkenstein Hennick and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant James Edward Maljanian guilty of driving or taking a vehicle without the owner's consent. (Veh. Code, § 10851, subd. (a).) The trial court sentenced defendant to prison for three years, but suspended execution of the sentence pending the successful completion of three years of formal probation.

Defendant raises two issues on appeal. First, defendant asserts the trial court erred by refusing his mistake of fact instruction. Second, defendant contends the trial court erred by denying his motion for new trial, which was primarily based upon a theory of ineffective assistance of counsel. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

The victim collects classic cars and sells classic car parts on the internet; he is not a professional car dealer. In 2011, the victim purchased three vehicles from Daniel Shimiaei. One of the vehicles was a 1969 Jaguar XKE (the Jaguar). The victim estimated the Jaguar was worth $12,000 to $25,000. The victim stored the Jaguar in a hangar at the El Monte airport. The victim knew defendant because defendant was also a tenant at the El Monte airport.

On August 29, 2011, the victim borrowed $25,000 from defendant. The written terms of the loan required the victim to pay defendant a fee of $1,950 and for the loan to be repaid by September 28, 2011. The writing also reflected the loan was secured by titles to two Jaguars; no identifying information was given for the Jaguars, such as models or license plate numbers.

By the end of September 2011, the victim had failed to repay the loan. On November 3, 2011, the victim and defendant agreed to extend the loan to November 27,

2

2011.  The written extension agreement reflects a change of one of the two Jaguar titles, from a "72 coupe v12" to a "69 conv. Jag," i.e., the Jaguar.  The title that the victim gave to defendant for the Jaguar was unsigned.  Shimiaei initially forgot to sign the title when he sold the Jaguar to the victim, which temporarily left the victim with an unsigned title.  On October 28, 2011, Shimiaei signed the title for the Jaguar.  The victim did not register the Jaguar in his name because he planned to use the Jaguar for parts.  The title for the Jaguar that the victim gave to defendant, on November 3, 2011, was the unsigned title from Shimiaei; however, by that date, Shimiaei had already signed the title.  Thus, there were two separate versions of the title in existence at the same time—one that was signed by Shimiaei, and one that was unsigned.  Defendant held the version from Shimiaei that was unsigned.  The victim gave defendant an unsigned car title to show good faith, not to allow defendant to register the Jaguar in defendant's name.

The victim failed to repay the entire loan balance by November 27, 2011, but continued making payments to defendant in 2012.  On January 9, 2013, defendant and the victim entered into a third written agreement (the 2013 agreement), which reflected the victim had repaid defendant $21,900 and that the victim would pay defendant more interest.  Another term of the 2013 agreement read, "3) Final payment of $1000 to be done by February-27-2013.  [¶]  Title for [the Jaguar] transfer at time of final monies paid, realeasing [sic] liability from [defendant]."  The victim was unhappy with the terms of the 2013 agreement.  However, the victim signed the 2013 agreement because it is "very hard to deal with [defendant] and his way of doing business.  [Defendant] just

3

has an approach that left [the victim] against the ball." The victim signed the 2013 agreement "under a lot of stress and duress."

On January 22, 2013, the victim paid defendant another $1,000, for a total repayment of $22,900; and that was the last payment the victim gave to defendant, which meant the principal and interest were not fully repaid. The victim never told defendant he could have the Jaguar. The victim explained, "It would be ludicrous to give him a car when I had already paid $24,000 [*sic*]."

Defendant told Shimiaei that the victim owed defendant money. Defendant contacted Shimiaei more than 10 times with "lots of late evening phone calls," asking Shimiaei to author a document reflecting defendant owned the Jaguar. Shimiaei said he "would not do that because that was not the case and that would be illegal." Defendant threatened to tell various law enforcement agencies that Shimiaei was "involved with dealing with stolen cars or cars that were in bad transactions." Shimiaei "eventually started getting calls from various different departments of law enforcement regarding this."

Defendant summoned the police to one of the victim's hangars at the El Monte airport. On May 14, 2013, the police arrived "in full swat outfits with their guns drawn, storming the place." The police asked the victim for the titles to the vehicles in the hangar. The Jaguar was not one of the vehicles the police asked about; the Jaguar was in a different hangar at the airport. Approximately one month later, the victim contacted the police "regarding the accusation of [defendant] regarding the Jaguar." The victim showed the police his purchase agreement, his loan agreement with defendant, and evidence that the victim had repaid "90 percent of the loan." The victim agreed to show

4

the police the Jaguar and have the VIN verified. The police came to the victim's hangar three or four more times to investigate the Jaguar; the time period for those visits is unclear.

In 2015, the victim rented 40-foot shipping containers at a storage facility in Chino from Merlin Smit. The Jaguar was placed in one of the shipping containers. On February 21, 2016, defendant called Smit. Defendant told Smit that defendant's Jaguar was in one of the victim's shipping containers and asked Smit to help defendant "get his car out of there." Smit agreed to meet defendant at the storage facility to help defendant remove the Jaguar. That same day, Smit met defendant at the storage facility. The victim had left one or two of the doors to the shipping container unlocked. Smit opened the container, defendant identified the Jaguar, and Smit helped defendant push the Jaguar out of the shipping container. Smit towed the Jaguar just outside the storage facility gate.

Defendant called Joe Young and asked Young to tow the Jaguar because it was not drivable. At approximately midnight, Young met defendant at the Chino storage facility. Young towed the Jaguar to one of Young's storage spaces in Pasadena. Defendant told Young that defendant owned the Jaguar. On February 22, 2016, the victim reported the Jaguar stolen.

Young tried to help defendant sell the Jaguar. Young contacted Jon Pollock, who specialized in classic Jaguars. Within a week of the Jaguar being towed to Pasadena, Pollock came to look at the Jaguar. Prior to Pollock's arrival, defendant removed the VIN tag from the Jaguar. The VIN tag had been located under the hood,

5

on the passenger side, on the bottom rail. It is not typical to remove a VIN tag when selling a car. A classic car has more value when the VIN tag is attached because, when it is not attached, there is an implication that the vehicle is stolen. Young asked defendant why he removed the VIN tag. Defendant replied, "Because there was problems with the title." Pollock was considering purchasing the Jaguar. After looking at the Jaguar, Pollock asked defendant for the VIN tag. Defendant told Pollock, "That doesn't come with the car."

In August 2016, a friend of Young and defendant "ran the VIN tag for [defendant]." At that point, Young contacted law enforcement and said Young was in possession of a stolen vehicle. Young spoke to Chino Police Detective Girasek. Young met Girasek at the storage facility. Girasek needed to identify the Jaguar but was unable to locate a VIN tag on the Jaguar. Young called Pollock who explained where a hidden VIN could be found on the Jaguar. Girasek found the hidden VIN and contacted the victim, who retrieved the Jaguar.

Luis Hernandez was an investigator for the DMV. Hernandez explained that a lien can be filed against a vehicle. The lien is filed with the DMV and provides notice that the vehicle will be sold if the money owed is not paid. Hernandez further explained that a vehicle can be transferred from one person to another by the prior owner of the vehicle either signing title over to the new owner, or, if the title is lost, by signing an "application for title with a transfer. But in all cases, they have to sign off the vehicle." Signing off means signing "a document under penalty of perjury indicating that they are

6

releasing their interest in the vehicle, and they're intending to transfer it to the new owner."

When there is a dispute over vehicle ownership, the DMV will "advise the parties to go to civil court, [and] have a judge rule on who should be awarded the vehicle. Once that judgment is given, the certified judgment would then be sent to the [DMV's] Involuntary Transfer Section . . . and then revert the title to reflect what the order of the Court was."

## DISCUSSION

### A.    MISTAKE OF FACT

#### 1.    *PROCEDURAL HISTORY*

Defense counsel requested the trial court instruct the jury on mistake of fact. (CALCRIM No. 3406.) Defense counsel pointed to evidence that defendant told at least one person, e.g., Young, that defendant was the owner of the Jaguar. Defense counsel asserted the jury could use that evidence to find defendant mistakenly believed he owned the Jaguar.

Defense counsel also pointed to the 2013 agreement, which reads in part, "Title for [the Jaguar] transfer at time of final monies paid, realeasing [*sic*] liability from [defendant]." Defense counsel argued that the 2013 agreement "on its face, talks about [defendant] releasing liability for the Jaguar when and if he was paid by [the victim]. Only an owner can release liability." Defense counsel argued, "So subsumed in that is the fact that [defendant] at that point is seen as the owner by the very language of the

7

[2013 agreement]." Defense counsel argued the jury could use that evidence to find that defendant had a good faith belief he owned the Jaguar.

The prosecutor asserted there was not substantial evidence of such a good faith belief. The prosecutor asserted the victim never gave defendant permission to take the Jaguar and there was no evidence of defendant perfecting title between 2013 and 2016, such that defendant could have had a good faith belief that he owned the Jaguar. The prosecutor pointed to the evidence of defendant removing the VIN tag and argued that it established defendant did not have a good faith belief that he owned the Jaguar.

The trial court predicted the prosecutor and defense counsel would argue to the jury about the meaning of the "releasing liability" portion of the 2013 agreement. The trial court noted that "nobody asked [the victim], 'What did that mean to you?' " The prosecutor asked to reopen her case to ask the victim that question. Defense counsel objected, arguing that the prosecution rested and should not be allowed to reopen its case based upon an instruction requested by the defense. The trial court denied both the prosecutor's request to reopen and defense counsel's request for a mistake of fact instruction. The trial court said, "I am not convinced that there was a good faith belief [o]n his part." Defense counsel asserted it was not a matter of the court being convinced. The trial court again said it would not instruct on mistake of fact.

2.    *ANALYSIS*

Defendant contends the trial court erred by denying his request to have the jury instructed on a mistake of fact. The mistake alleged by defendant is that he believed he owned the Jaguar.

8

"Pinpoint instructions ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1173-1174.) A trial court may properly refuse to give a pinpoint instruction when the instruction is not supported by substantial evidence. (*People v. Burney* (2009) 47 Cal.4th 203, 246.) We apply the de novo standard of review when examining whether the trial court erred by refusing a pinpoint instruction. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) When evaluating the evidence to determine whether a pinpoint instruction should be given, the court should view the evidence "under the defendant's account of events." (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

Theft or taking of a vehicle requires evidence of a defendant's specific "intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle." (Veh. Code, § 10851, subd. (a).) Specific intent can be disproven when the defendant committed the charged act "under an ignorance or mistake of fact." (Pen. Code, § 26.)

"A mistake of fact must be in good faith." (*People v. Watt* (2014) 229 Cal.App.4th 1215, 1218.) " ' "Good faith, or its absence, involves a factual inquiry into the plaintiff's subjective state of mind [citations]: Did he or she believe the action was valid? What was his or her intent or purpose in pursing it? A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." ' " (*People v. Superior Court* (*Sokolich*) (2016) 248 Cal.App.4th 434, 447.)

The most favorable finding for defendant that could be made in regard to good faith is that defendant believed, in good faith, that he had some interest in the Jaguar because the Jaguar was collateral for a loan that was not fully repaid to defendant. The nature and validity of the interest claimed by defendant would need to be determined in some manner, e.g., via a civil lawsuit, a DMV lien, or voluntary settlement with the victim.

There is no evidence indicating that defendant took the legal steps necessary to take possession of the Jaguar as collateral for the loan. There is no evidence indicating the victim voluntarily released liability for the Jaguar to defendant. There is no evidence indicating the victim voluntarily gave defendant physical possession of the Jaguar. Thus, there is no evidence to support a finding that defendant, in good faith, believed he had the right to physically take the Jaguar from the Chino storage container.

To the contrary, there is evidence that defendant knew he did not have the right to take possession of the Jaguar. In particular, starting in 2012, defendant tried more than 10 times to pressure Shimiaei to falsify a document reflecting Shimiaei sold the Jaguar to defendant. That evidence establishes that, prior to defendant removing the Jaguar from the Chino storage facility, defendant was aware that he was missing necessary documents to take possession of the Jaguar. Also, defendant removed the VIN tag from the Jaguar, which shows that, after defendant took the Jaguar, he remained aware that he lacked the right to possess the Jaguar.

Thus, there is evidence from which one could conclude that defendant believed, in good faith, that he had an unsettled claim to a security interest in the Jaguar, but there

10

is no evidence from which one could find that defendant believed, in good faith, that he had a right to remove the Jaguar from the Chino storage container. Therefore, the trial court did not err by refusing to instruct the jury on mistake of fact.

Defendant contends the jury could infer that defendant had a good faith belief that he owned the Jaguar from the evidence that the Jaguar was collateral for the loan that was not fully repaid. The evidence reflects that, as collateral for the loan, the victim gave defendant an unsigned title for the Jaguar. With an unsigned title, defendant could not register the Jaguar. Thus, defendant held a document that clearly was incomplete and did not provide him with title, in that it lacked signatures. Given the obvious lack of signatures on the title held by defendant, the jury could not have found a good faith belief of ownership based upon that evidence. At most, the jury could find defendant had an unsettled claim to the Jaguar.

In defendant's appellant's reply brief, defendant writes, "There was strong evidence that [defendant] in good faith believed he was entitled to ownership of the Jaguar when [the victim] refused to pay back the loan secured by the car, for which he had a signed title." It is unclear who defendant is asserting held the signed title. To the extent defendant is asserting that defendant held the signed title for the Jaguar, he provides no record citation to support that assertion. The record reflects there were two versions of the title—one signed by Shimiaei and one unsigned by Shimiaei. In our reading of the record, the evidence only reflects that defendant held the unsigned version of the title.

11

Defendant points to evidence that defendant called the police to the victim's hangar at the El Monte airport as evidence that defendant had a good faith belief that he owned the Jaguar. The problem with relying upon that evidence is that, in 2013, the police questioned the victim about the Jaguar, looked at the victim's documents, verified the Jaguar's VIN, and the Jaguar remained with the victim. Given that the police left the Jaguar with the victim, one cannot infer from that evidence that defendant believed defendant was the rightful owner of the Jaguar in 2016. Perhaps defendant believed when he contacted police in 2013 that he was the rightful owner, but upon the police leaving the Jaguar with the victim, defendant would have learned that defendant was not the owner of the Jaguar. Thus, the evidence of defendant contacting the police in 2013 does not demonstrate that, in 2016, defendant had a good faith belief that he could remove the Jaguar from the Chino storage container.

Next, defendant asserts the evidence of defendant telling Young that defendant owned the Jaguar is evidence of defendant's good faith belief that he owned the Jaguar. There is no evidence to explain why defendant would have subjectively believed that he owned the Jaguar. As explained *ante*, as collateral for the loan, the victim gave defendant an unsigned title and the victim retained physical possession of the Jaguar. Thus, defendant had neither a title he could register nor physical possession of the Jaguar. Given the evidence, one could not reasonably conclude that defendant held a good faith belief that he owned the Jaguar; rather, one could, at most, conclude that defendant believed he had an unsettled claim to the Jaguar and that defendant chose to

12

bypass the civil legal system and resort to self-help to try to settle the issue of ownership.

Also asserted is that defendant may have been unaware of the legal paths to obtain ownership of the Jaguar and therefore believed in good faith that he could take the Jaguar. Defendant's argument fails because is there is no evidence of defendant's lack of awareness of civil remedies. (See *People v. Mayberry* (1975) 15 Cal.3d 143, 157 [defendant bears the burden of proof for a mistake of fact defense].) Thus, one cannot infer a good faith belief based upon a lack of knowledge of civil remedies because there is no evidence of a lack of knowledge of civil remedies.

B.     MOTION FOR NEW TRIAL

1.     *PROCEDURAL HISTORY*

a.     Los Angeles Case

In Los Angeles County, defendant was charged with two felonies, one of which alleged defendant perjured himself on a DMV certificate of title (Pen. Code, § 118, subd. (a)). In that case, on February 24, 2014, defendant plead no contest to a misdemeanor charge of furnishing an altered certified copy of an official record (Pen. Code, § 115.3); the two felony charges were dismissed. One of the terms of defendant's probation was that he not harass the victim—the same victim as in the instant case.

b.     Pretrial Motion

In the instant case, prior to the start of trial, defense counsel moved to exclude evidence of defendant's Los Angeles conviction, except for impeachment purposes. The prosecutor argued the misdemeanor conviction pertained to the instant case, in that

13

the misdemeanor concerned defendant wrongly registering the Jaguar in his name. The prosecutor argued that the 2014 conviction was relevant to show intent and knowledge when defendant took the Jaguar in 2016. (Evid. Code, § 1101, subd. (b).) Defense counsel argued there was no factual basis for the plea explicitly given in the record of conviction. The trial court ruled that the Los Angeles conviction could only be used for impeachment purposes. The court explained that the prosecutor's argument failed because the conviction did not prove that defendant did not own the Jaguar, it only proved that defendant failed to properly complete the paperwork for the Jaguar.

### c.    Motion for New Trial

Defendant's trial attorney was Mr. Turcu. After the jury's verdict, defendant changed attorneys, and the new attorney, Mr. Lobato, moved for a new trial based in part on ineffective assistance of counsel by Turcu. Lobato asserted defendant registered the title for the Jaguar in defendant's name, at the DMV, on October 30, 2012, which is the reason the 2013 agreement discussed defendant releasing liability for the Jaguar. Lobato contended Turcu was ineffective for failing to introduce the 2012 title because it would have provided proof of defendant's mistaken belief that he owned the Jaguar. Lobato also asserted Turcu was ineffective because he did not allow defendant to testify. Lobato represented that defendant would have testified that he registered the Jaguar's title in his name in order to pressure the victim to repay the loan, i.e., it was a tactic to collect the debt.

14

d. <u>Opposition</u>

The prosecutor opposed defendant's motion and attached exhibits to the opposition. One of the exhibits was a preconviction probation report (Pen. Code, § 1203.7) for the 2014 Los Angeles plea. The probation report reads, in part, "On October 30, 2012, the defendant entered the Pasadena DMV Office and registered the Jaguar in his own name even though he had not legally purchased it and was not the legal owner."

Another exhibit is the Los Angeles Sheriff's Department incident report related to the charges that led to the 2014 plea. The report is written by Los Angeles Sheriff's Detective Thorne. In the report, Thorne explains that defendant contacted law enforcement officers and informed them that defendant obtained the Jaguar from Shimiaei in August 2011, and that the victim stole the Jaguar from defendant. As part of his investigation, Thorne "contacted the DMV law enforcement line and ordered Certified VIN histories on the . . . Jaguar [, which] would give [him] information on registration activity for the past several years on the Jaguar." Thorne found "a 'Notice of Release of Liability' on file with the DMV showing Mr. Shimiaei selling the . . . Jaguar to [the victim] in 2011."[1] Shimiaei told law enforcement officers that he sold the Jaguar to the victim.

In Thorne's incident report he wrote, "When [the victim] gave the . . . Jaguar Title to [defendant] to 'hold' pending the full payment of their loan agreement, he did

_____

[1] The victim did not register the Jaguar in his name, but Shimiaei filed paperwork reflecting he sold the Jaguar.

15

not give [defendant] authorization to register the . . . Jaguar in his name and claim the car was his. But that is what he has done. [Defendant] has taken the . . . Jaguar Title, signed off (releasing interest in the vehicle) by . . . Shimiaei on 10-23-11 and registered the car in his name. He turned over the State of California Certificate of Title and wrote that as of 10-30-12 he purchased the 1969 Jaguar. In addition to this, he reported the purchase price for the Jaguar was $500.00 dollars. [Defendant] also signed the back of the Certificate of Title under the statement that reads 'I certify (or declare) under penalty of Perjury under the laws of the State of California that the foregoing is true and correct.' [¶] [Defendant] committed Perjury (118 PC) when he signed the Title, went into the Pasadena DMV Office and reported to the DMV he bought the 1969 Jaguar from . . . Shimiaei on 10-23-12 for $500.00. He also perjured himself when he reported to the DMV he paid $500.00 for a car worth over $10,000 dollars."

### e. Hearing

At the hearing on defendant's motion for new trial, the prosecutor summarized Lobato's argument as asserting the 2012 title for the Jaguar should have been introduced as evidence of defendant's good faith belief that he owned the Jaguar. The prosecutor asserted Lobato's argument failed because defendant was convicted of "illegally altering an official record that had to do with putting title of the [Jaguar] in his name." The prosecutor contended the Los Angeles conviction proved defendant "was on notice that he did not have legal title to the [Jaguar]."

Lobato asserted the prosecutor was making "a huge assumption" and that there was nothing in the Los Angeles record of conviction indicating that defendant's plea

16

related to the Jaguar or the DMV. The trial court asked Lobato what altered document formed the basis of defendant's Los Angeles conviction. Lobato said there was no way of knowing because no factual basis was given for the plea. Lobato asserted that, during trial, the victim should have been asked (1) if he had seen the 2012 Jaguar title registered in defendant's name; and (2) if the provision about defendant releasing liability for the Jaguar was put in the 2013 agreement because of the 2012 title. Lobato asserted that without the 2012 title and the victim's testimony about the 2013 agreement, defendant was effectively denied his mistake of law defense, and that denial of the defense demonstrated ineffective assistance of counsel by Turcu.[2]

The trial court noted the victim and Shimiaei testified that they had never given defendant a signed title. The trial court asserted that defendant's conviction for altering a document is the only indication of how defendant obtained title in 2012, so evidence of the 2012 title would not have established defendant's good faith belief that he owned the Jaguar. The trial court concluded, "I really don't have any good faith evidence." The trial court denied the motion for new trial and noted that Turcu had tried to pursue a mistake of fact defense.

---

[2] Lobato repeatedly referred to CALCRIM No. 3411, which is the instruction for a mistake of law. The mistake of fact jury instruction is CALCRIM No. 3406. The record indicates Lobato intended to argue mistake of law, rather than mistake of fact, as Lobato said, "This is CALCRIM 3411, which deals with mistakes of law" and "But 3406, which is a mistake of fact, that's 3411 of the CALCRIM." The prosecutor responded to Lobato's argument by discussing law pertaining to mistake of fact. Later in Lobato's argument, he switched to arguing mistake of fact.

17

## 2.    *ANALYSIS*

Defendant contends the trial court erred by denying his motion for new trial. Defendant asserts Turcu was ineffective for failing to introduce the 2012 title because "[t]he strongest claim [defendant] could make was that he owned the Jaguar as evidenced by the title that he had obtained in 2012."

When the trial court denies a motion for new trial that is based upon ineffective assistance of counsel, we apply a hybrid standard of review.  We defer to the trial court's factual findings if they are supported by substantial evidence, and we apply the de novo standard of review over the ultimate issue of whether defendant was denied effective assistance of counsel.  (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725; see also *People v. Nesler* (1997) 16 Cal.4th 561, 582.)  To demonstrate ineffective assistance of counsel, a defendant must establish " 'that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.' " (*Taylor*, at pp. 724-725.)

Defendant appears to envision a version of the trial where the 2012 title is introduced, and the prosecutor is not permitted to provide any evidence in response.  A more realistic version of the trial is that if Turcu introduced the 2012 title, then the prosecutor would have called Los Angeles Sheriff's Detective Thorne, who investigated the 2014 altered document case, to testify about the 2012 title.  Thorne would testify about defendant's falsehood to law enforcement that defendant purchased the Jaguar from Shimiaei in 2011, and defendant's falsehood on the DMV certificate of title that he purchased the Jaguar for $500.  (See Evid. Code, § 1220 [party admission]; see also

18

*People v. Anderson* (2018) 5 Cal.5th 372, 403 [criminal defendant's hearsay statement came within the hearsay exception].)

Thus, if Turcu introduced the 2012 title, then he would have opened the door for the prosecutor to have Thorne testify about the falsity of the 2012 title. By not introducing the 2012 title and by having the 2014 conviction excluded, Turcu helped to prevent the jury from hearing about Thorne's investigation. To the extent defendant wanted to use the 2012 title (1) to prove defendant was the owner of the Jaguar, Thorne's testimony would have been harmful because it would have shown the underlying basis for the title was false, e.g., defendant's falsehood that he purchased the Jaguar from Shimiaei, indicating the title was not a reliable source for proving ownership; and/or (2) to prove defendant's subjective belief that he owned the Jaguar, Thorne's testimony would have been harmful because it would have shown that defendant knew, prior to 2016, that defendant was not the owner of the Jaguar due to the results of the criminal investigation surrounding the 2012 title.

Turcu could have reasonably concluded that opening the door to Thorne's testimony would be more harmful to defendant's case than helpful, and that the better course was to omit the 2012 title so as to prevent Thorne from being called as a witness. Therefore, we conclude the trial court did not err in finding Turcu rendered effective assistance.

Defendant asserts Turcu should have called the owner of the Chino storage facility, Charlie McBride, to testify that when he checked with the DMV to identify the owner of the Jaguar, the DMV informed McBride that defendant owned the Jaguar.

19

Defendant fails to explain what hearsay exception would cause this evidence to be admissible. Due to the lack of analysis concerning admissibility, we are not persuaded that the trial court erred. Moreover, in regard to relevance, no evidence was proffered that McBride shared the DMV information with defendant, so as to aid in proving defendant's state of mind.

Defendant asserts Turcu should have called defendant to testify because defendant would have testified that defendant registered the Jaguar in his name to pressure the victim to sign the 2013 agreement and repay the loan. Defendant asserts this evidence would prove good faith, but fails to explain how it would do so. The proposed testimony provides no insight into why defendant believed he owned the Jaguar. Moreover, the testimony would invite impeachment related to the Los Angeles conviction. Accordingly, we conclude the trial court did not err on this point.

Defendant's ineffective assistance of counsel argument was his primary argument in his motion for new trial, but it was not the sole issue in the motion. Defendant also raised issues of denial of a fair trial, prosecutorial misconduct, and the verdict being contrary to the evidence. On appeal, defendant raises issues related to these alternate bases for the motion for new trial, which we will address in turn.

First, defendant contends he was denied a fair trial, or the ability to present a defense, by the combination of Turcu's failure to introduce the 2012 title and the trial court's refusal to give the mistake of fact instruction. We have explained *ante* that defendant failed to demonstrate that Turcu was ineffective, and we have explained *ante* that the trial court did not err by refusing to instruct the jury on the law of mistake of

20

fact. Consequently, we conclude defendant failed to demonstrate that he was denied a fair trial, and therefore we conclude the trial court did not err by denying the motion for new trial on this point.

Second, defendant contends the trial court erred by denying his motion for new trial because the prosecutor committed misconduct by misrepresenting to the trial court that defendant's Los Angeles conviction involved fraud related to the Jaguar, when the record of conviction did not reflect that. A prosecutor commits misconduct by using deception to persuade the trial court. (*People v. Morales* (2001) 25 Cal.4th 34, 44.) We apply the abuse of discretion standard of review when reviewing the denial of a motion for new trial that is based upon alleged prosecutorial misconduct. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)

A defendant bears the burden in a motion for new trial. (*People v. Watts* (2018) 22 Cal.App.5th 102, 116-117.) Defendant failed to sustain his burden in this case. In the motion for new trial, defendant did not offer a declaration from himself, his Los Angeles attorney, or the Los Angeles prosecutor to explain the factual basis for defendant's plea, so as to prove that the prosecutor in the instant case was incorrect. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 54 [three sworn declarations filed with a motion for new trial]; see also *People v. Lavender* (2014) 60 Cal.4th 679, 693 [discussing declarations and an evidentiary hearing for a motion for new trial]). Defendant does not address the probation report and Thorne's incident report, which both reflect the 2014 charges were related to false registration paperwork that defendant gave to the DMV concerning the Jaguar, e.g., defendant's falsehood that he paid

21

Shimiaei $500 for the Jaguar. Due to the lack of evidence offered by defendant to prove the prosecutor made a misrepresentation, and defendant's failure to address the probation report and Thorne's incident report reflecting the prosecutor's representation was accurate, we conclude the trial court did not err by denying the motion for new trial on this ground.

Third, defendant contends the trial court erred by denying his motion for new trial because the verdict is contrary to the evidence. In deciding whether a verdict is contrary to the evidence, the trial court must independently review the evidence to determine if there "is sufficient evidence to sustain the verdict." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.) We review the trial court's ruling under the abuse of discretion standard of review. (*Id.* at p. 1252.)

Defendant contends the Jaguar was registered in his name, and the victim was aware of the 2012 title as shown by the 2013 agreement, which indicates a legal transfer occurred. Defendant's argument ignores critical evidence. The 2013 agreement was signed in January 2013; and, in June 2013, the police examined the Jaguar and the victim's paperwork for the Jaguar, and the police left the Jaguar with the victim. If the victim acquiesced to defendant's ownership of the Jaguar, then the victim would not have demonstrated to police that the victim owned the Jaguar in June 2013. Moreover, the victim testified that he disagreed with the terms of the 2013 agreement and that he signed the 2013 agreement under duress. One could conclude from that testimony that the victim did not agree with the term in the 2013 agreement about defendant releasing liability for the Jaguar because the victim did not agree that defendant owned the

22

Jaguar. Further, the victim testified, "It would be ludicrous to give [defendant] a car when [the victim] had already paid" a majority of the money owned on the loan. From that evidence one can conclude the victim would not have acquiesced to defendant taking ownership of the Jaguar. Thus, there is evidence from which one could conclude that the victim did not acquiesce to defendant taking ownership of the Jaguar. Because defendant fails to address all of the evidence, we are not persuaded that the trial court abused its discretion.

Defendant contends the trial court erred by not reducing his conviction to a misdemeanor. Defendant contends the felony finding was contrary to the evidence because the Jaguar was worth less than $950. (Pen. Code, § 490.2; *People v Page* (2017) 3 Cal.5th 1175, 1183.) Defendant points to testimony that the Jaguar's floorboards were rusted through and asserts the victim's valuation of the Jaguar at $12,000 to $25,000 is implausible. Young testified that, while the Jaguar was "a rust bucket," it had "a lot of parts . . . that could still be used for somebody restoring Jaguars." Young estimated that the Jaguar, as a parts car, was worth $10,000 to $15,000. Defendant fails to explain why it was implausible for the Jaguar to be worth more than $950 as a parts car. Accordingly, we are not persuaded that the trial court abused its discretion by denying the motion for new trial on this point.

In sum, the trial court did not err.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

McKINSTER _____

Acting P. J.

FIELDS _____

J.